## Case No. 16,036.

### UNITED STATES v. PETERSBURG JUDGES OF ELECTION.

### SAME v. PETERSBURG REGISTRARS OF ELECTION.

[1 Hughes, 493; 14 Am. Law Reg. (N. S.) 105, 238; 9 Am. Law Rev. 370.] [1]

Circuit Court, E. D. Virginia. 1874.

ELECTIONS—ENFORCEMENT ACT OF 1870—PREVENTING REGISTRATION—INDICTMENT—CONSTITUTIONAL LAW—CITIZENSHIP.

1. An indictment charged that defendants unlawfully prevented, etc., from voting at a municipal election in Petersburg, certain legally registered voters qualified according to law. Another indictment charged that defendants refused to register certain legally qualified electors of African descent, as voters at the said election. On demurrer it was held, by Bond, Circuit Judge, that the indictments were sufficient, and that the motive of hostility as to race, etc., might be inferred from the acts charged; Hughes, J., contra, that the indictments

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission. 14 Am. Law Reg. (N. S.) 105, and 9 Am. Law Rev. 370, contain only partial reports.]

were defective for not charging that the acts were done on account of race, color or previous condition of servitude, and that they should be quashed.

2. Per Hughes, District Judge. The 4th section of the enforcement act of May 31, 1870 [16 Stat. 140], is not founded on the fifteenth amendment, and is unconstitutional.

3. Id. The federal courts have no jurisdiction to protect rights which accrue from the citizenship of a state, but only such as accrue from citizenship of the United States. The right to vote belongs to the former class. It is not a natural or inherent right, but a privilege conferred or withheld by the several states in their own discretion. The only guarantee of the United States in this connection is under the fifteenth amendment, that no state shall deny or abridge the privilege on account of race, color, or previous condition of servitude. The only case in which the federal courts can entertain jurisdiction of any question upon this right is where violation of this guarantee is alleged.

4. Per Bond, Circuit Judge. The fourteenth amendment declares what shall constitute citizenship of the United States as well as of the several states, and gives congress the power to protect the citizen in all the franchises, rights, and privileges which belong to him either as a citizen of the United States or of a state.

[Cited in Ex parte Kinney, Case No. 7,825.]

5. The rights which are given to a citizen by a state, such as the right to vote when possessing certain qualifications, may be modified or taken away by the state, and the United States cannot interfere, but so long as the right remains, the United States has the power to protect him in its enjoyment and exercise.

6. Rights which do not arise from citizenship but accrue to men as men, such as the security of life and property, remain under the exclusive protection of the states.

7. The enforcement act of May 31, 1870, providing for the punishment of obstructing voters, is appropriate legislation to enforce the fourteenth amendment, and is, therefore, constitutional; and an indictment under it charging the prevention of legally qualified citizens of Virginia from voting, and the refusal to register such citizens as voters, is valid and sufficient, although it does not charge that the acts were done on account of race, color, or previous condition of servitude of the citizens.

The cases first named above were indictments against the judges who held the municipal election of Petersburg in 1874, respectively at eight precincts in that city. They charged that at a municipal election held there on the 2d May, 1874, these defendants (respectively naming three at each precinct) did unlawfully prevent and obstruct from voting divers persons, to wit, A., B., etc., "citizens of the United States, twenty-one years old, residents of Virginia for more than twelve months, and of Petersburg for more than three months, resident and legally registered voters in said election, and otherwise qualified by law to vote at said election," at the said precincts respectively. The second cases above named were indictments against the defendants for refusing to register as voters certain citizens, etc.

The defendants demurred to the indictments on the grounds: (1) That there is no averment in any of the counts in the said indictment that the acts of commission and omission charged as criminal in said indictment were done or omitted to be done because or on account of "race, color, or previous condition of servitude" of the persons whose rights are averred to have been denied, diminished, impaired, or obstructed by the alleged acts of commission and omission of the defendants. (2) That the said acts and omissions are not averred to have been done under color or in execution of any state law or authority. (3) That the act of congress, or that part of it on which the said indictment is formed, is unconstitutional and void.

R. T. Daniel, for demurrers.

L. L. Lewis, U. S. Dist. Atty.

Before BOND, Circuit Judge, and HUGHES, District Judge.

BOND, Circuit Judge. It is conceded in the argument that had this been at an election for members of congress or for presidential electors the demurrer would have been bad; or that if the pleader had charged that the unlawful obstruction was on account of the race, color, or previous condition of servitude of the electors, no fault could have been found with the indictment. But this was not at a federal election, nor does the indictment charge that the obstruction was made on account of race, color, or previous condition of servitude. The question then is whether or not there is constitutional power in congress to protect a citizen of the United States, qua citizen, in the exercise of the elective franchise, either by force of the fourteenth or fifteenth amendment of the constitution. Citizenship of the United States prior to the passage of these amendments was, to say the least, but an ill-defined relation. It was by many thought to be derivative, and not direct. A person became a citizen of the United States by force of his citizenship of some one of the states. It was as a citizen of a state that he had a right to sue in federal courts, and hence a large number of our fellow-citizens during the late civil war were led to think that as they first became citizens of the state, and indirectly through that relation citizens of the United States, their allegiance was first due to the state, and secondarily to the United States. It seems to me that the object of the first clause of the first section of the fourteenth amendment was to settle this question of allegiance forever, and to make the United States a nation by declaring "that all persons born in the United States are citizens thereof," owing allegiance upon birth, and that consequently the power to protect such persons as owed this allegiance belonged to the United States as fully as the power to protect its citizens for the purposes of its organization inheres in any other nation. Whether a person's duty to the state or to the United States is paramount, was the question fundamental in the war; and after the expenditure of so much blood and treasure, the people through their legislatures thought

it not right to leave the matter doubtful, and so declared in this amendment that not only are all persons born or naturalized in the United States citizens thereof, but are also citizens of the states wherein they reside, thus establishing not only what constituted citizenship of the United States, but, so far as this description of persons is concerned, what constituted citizenship of a state.

Congress is empowered to enforce these two relations created by this amendment by appropriate legislation. It has seen fit since the adoption of it to legislate upon the right to vote only. It is objected to this legislation, which, so far as these cases are concerned, is contained in the 4th section of the act of May 30, 1870, which provides "that if any person by force, bribery, threats, intimidation, or other unlawful means, shall hinder, delay, or prevent, or obstruct any citizen from doing any act required to be done to qualify him to vote, or from voting at an election," etc., that the right to vote is not a privilege or immunity of a citizen of the United States as such, and that, therefore, it does not come within the power of congress to legislate concerning it. But the constitution of the state of Virginia declares in its third article that "every male citizen of the United States, twenty-one years of age," who shall have the requisite qualifications, shall have the right to vote; and now the question is, as the right to vote at an election in Virginia is not a right absolute, dependent solely upon citizenship, but a right which the state may modify and control, has congress the power, where and while the right is given, to protect a citizen in the exercise of it?

It may be fairly concluded that what is meant by citizenship of the state is the same, so far as the power to protect that relation goes, though it may not be coextensive in the privileges given, as is meant by citizenship of the United States. A state has the undoubted right to control, protect, tax, and summon to arms its citizens to promote the objects for which it exists. And when the fourteenth amendment declares that all persons born within the jurisdiction of the United States are citizens of the state in which they reside, every such person becomes liable to these burdens and is entitled to this protection. This will be admitted. When the same amendment declares that such persons are also citizens of the United States, it must mean that they shall occupy the same relation to the general government so far as its purposes are concerned. These purposes we are not left in doubt about, for the constitution of the United States declares in its preamble that the object of the government is to form a more perfect union, establish justice, insure domestic tranquility, provide for the common defence, and to secure the blessings of liberty to ourselves and our posterity. Whatever, therefore, if a state had these objects for its organization, it might require its citizens to do or to refrain from doing to pro-

mote them, it seems to me the United States may require. The citizenship which owes its allegiance to each is now created by the same paragraph of the fourteenth amendment, and each may summon its citizens to enforce them, or defend them in so doing. In a republican form of government the duty of voting is as responsible a burden as that of bearing arms. The government cannot exist without the power to require both; and if it may protect the citizen in the one obligation, I see no reason, if it be desired to preserve its existence, why it may not do so in the other. If, therefore, a state, by virtue of a person's relation to it as citizen, claims, and has always claimed, the right to protect him in the exercise of a right granted by the United States, surely the United States is not claiming unlawful authority when it undertakes to protect one of its own citizens in a right granted by a state to him as a citizen of the United States. Now the right to vote at a federal election is bestowed by the constitution of the United States upon such citizens of the states as have the requisite qualifications for electors of the most numerous branch of the state legislature. The state prescribes the qualifications for such electors; but being designated by the state through qualifications prescribed, the United States grants them the right to vote at a federal election. Every state by its laws protects its citizens in the exercise of this right, with which, not the state, but the United States clothes them. If this be within the power of the state by virtue of the citizenship of its citizens, why may not the United States protect its citizens to the fullest extent in a right with which a state clothes them? But this fourteenth amendment goes much farther than this. It declares that all persons born or naturalized in the United States are citizens of the state wherein they reside, and that congress shall enforce this by appropriate legislation.

That which constitutes citizenship, if it be not the mere privilege of calling oneself citizen, must be the prerogatives, franchises, rights and privileges which the state governments grant to those occupying that relation, in return for the performance of the duties which spring from allegiance and citizenship; and unless this amendment was inane, fruitless and ineffectual, it must mean that congress by appropriate legislation can protect the citizen of a state in the exercise of all the rights conferred upon him as such, and which distinguish him from those who are aliens or merely residents in the state. The exercise of this power on the part of the United States can in nowise interfere with the right of the state to prescribe the qualifications of citizens to vote, nor with their privileges and immunities in any other respect. That power remains as heretofore with the state, with the exception that they shall not make race, color, or previous condition of servitude a ground of distinction. It only asserts the power of the United States in return for his

allegiance to protect the citizen in the rights which the federal government grants, and in such as the states from time to time voluntarily bestow upon him, and which they can continue or withdraw at pleasure. There is a citizenship of the states and a citizenship of the United States. What the states may do by reason of this relationship the United States may do. To give any other construction to the clauses of the fourteenth amendment we have been considering would be to say that everybody born or naturalized in the United States had a right to call himself citizen, and that the amendment drew the relation of citizenship no closer than before its adoption; and that in view of the great contest just over, the people adopted an amendment declaring every one born or naturalized in the United States a citizen, and that congress might enforce that nominal relation, and the empty claim to be called such, by appropriate legislation. To overrule this demurrer, it is necessary to claim only that the sovereignty of the United States is equal in its sphere for the protection of the rights and privileges of citizens, to that claimed by the states in the protection of their own. Nor does this construction of the amendment interfere with the rulings of the supreme court in what is known as the Slaughterhouse Cases, 16 Wall. [83 U. S.] 36.

The right to slaughter animals within the limits of the city of New Orleans was not a right appertaining to citizenship at all. Aliens might do it; but in these cases the right to vote is given to all citizens of the United States as such, and no one else can exercise it. It is an immunity, a defence, a privilege peculiar to that relation, and is not shared in common with all persons whatsoever. It was not personal to a man by reason of his manhood at common law. It is the endowment of the state, peculiar to citizenship. Before the state was, men had certain rights which belonged to them because they were men. As our Declaration of Independence declares, men are born with certain inalienable rights. These rights we· do not contend the fourteenth amendment empowers the United States to protect. It is only such rights, privileges and immunities as the state or the United States, confers upon them because of their citizenship to the United States, that the laws of the United States can insure. The fear that this construction will draw into the United States courts all cases of offences against the person and property of individuals is groundless. The rights which are inalienable and belong to men as men, and not as citizens, are life. liberty, and the pursuit of happiness. The right to be secure in one's person or property is not peculiar to citizenship. Citizens share that with aliens. Offences against the person as well as those against property are cognizable in the state courts, except where the controversy arises between citizens of differ-

ent states, a choice of forum is given; but all such privileges as are peculiar to citizenship this fourteenth amendment, it seems to me, was adopted to enforce. And all that the supreme court decided in the Slaughterhouse Cases, was that the United States by force of the fourteenth amendment was not clothed with authority to enforce the rights common to all men but those only peculiar to citizenship.

The right to vote is not the common right of. all persons resident in Virginia. It is not the right of all citizens of Virginia per se, because a person might be a citizen of Virginia who is not a citizen of the United States, and the constitution of the state confers the right to vote upon citizens of the United States solely. The demurrer insists upon it, that as the state has passed no law abridging the right of citizens in any particular, the indictment is bad. This view leaves out of consideration the final clause of the fourteenth amendment, which empowers congress to enforce its provisions by appropriate legislation. The mischief to be prevented by the fourteenth amendment was the obstruction of the citizen in the exercise of the rights of citizenship, whatever they from time to time might be. There is no way as yet pointed out by which a state can be punished, and the mischief sought to be prevented might be flagrant in violation of state law, or without any color of authority under it. The white people in Virginia might, without law or in spite of it, determine that no colored man should vote, and the colored people in South Carolina might, in the same unlawful manner, unite to violently obstruct their white fellow-citizens from exercising the elective franchise. The mischief to be prevented would be flagrant, and yet if this demurrer be good, no remedy could be found. Now congress, in this view of the' case, has thought it appropriate legislation to punish the individuals who commit the wrong, whether under color of state authority or without pretending to any authority at all. Who can say that this is not appropriate legislation? It remedies the existing evil; and a law which accomplishes or tends to accomplish a purpose required by the constitution to be effected, cannot be said by a judicial tribunal to be inappropriate. Fugitive Slave Law, Act Sept. 16, 1850 [9 Stat. 462].

In answer to the objection that these indictments do not allege that the obstruction had was done on account of race, color, or previous condition of servitude, it is sufficient to say that the statute under which the indictments are drawn uses no such language; and it is most generally sufficient in setting out in pleading a statutory offence, to use the words of the statute creating it. But if it be contended that the only power congress had to pass the statute was that granted by the fifteenth amendment, which prevents discrimination among vot-

ers on account of race, color, or previous condition, etc., and authorizes appropriate legislation to prevent such discrimination, there is answer to it in this, that it is impossible to prove, though the fact may be so, if a body of colored men in South Carolina assault and beat fifty white people at the polls and prevent their voting, and at the same time knock two colored people down, that this was done on account of race or color. Congress thought to cut the thing up by the roots, and enacted what is really and practically the only appropriate legislation, as any person who has seen the efforts to enforce this section must know, that no person shall disturb another at an election to prevent his exercise of the franchise; and as the greater includes the less, if he can do so from no motive he cannot do it because of race, color, or previous condition, etc.

And from these considerations we have drawn the following conclusions:

1st. That by the fourteenth amendment to the constitution the people have provided a citizenship to the United States, direct, positive and paramount, springing from birth within its jurisdiction, or by statutory naturalization.

2d. That what the states have claimed to do by virtue of their sovereign power over their citizens, the United States may do over its citizens by virtue of its sovereign power and the direct relationship thus established.

3d. That while the fourteenth amendment, in furtherance of this view, declares that no state shall make or enforce any law contrary to this provision, it likewise declares that congress shall enforce the amendment by appropriate legislation. And that as congress cannot punish a state qua state, it is appropriate legislation within the meaning of the statute to attain its end, i. e., the protection of the citizen in his right to vote by punishing the individuals who obstruct him in its exercise.

And that even under the fifteenth amendment, where experience has shown the obstruction of voters on account of race and color cannot be, in the judgment of congress, otherwise prevented, it is appropriate legislation to provide by statute that no such obstruction shall take place at all.

And that this construction of the fourteenth and fifteenth amendments does not affect the rights of the states to define the rights of citizenship, nor does it draw into the jurisdiction of the United States courts the question of the invasion of the rights of persons or property, as such. It concerns only the rights which distinguish persons as citizens, and which they hold in that character.

HUGHES, District Judge. If the election described, instead of being for municipal officers, had been for a member of congress or presidential electors of the United States, these indictments, for reasons which need not here be set forth, would have been valid to give jurisdiction to this court, and would have been founded on those sections of the enforcement acts of congress which expressly relate to national elections. On the other hand, if the indictments had charged that the persons prevented from voting at this state election were persons of Saxon, Celtic, Mongol, African, or other descent, and that the defendants prevented them from voting on account of race, then, being founded upon those sections of the enforcement acts which were designed to enforce the fifteenth amendment of the national constitution, they would have given jurisdiction to this court: because the fifteenth amendment expressly declares that "the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude." The offence charged, however, is clearly not within either of these categories. If it had been, the jurisdiction of this court to try it would have been undeniable.

The indictments are really founded upon the 4th section of the enforcement act of May 31st, 1870, which declares that "if any person, by force, bribery, threats, intimidation, or other unlawful means, shall hinder, delay, prevent, or obstruct, . . . . any citizen from doing any act required to be done to qualify him to vote, or from voting at any election (by the people in any state, territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision), such person shall for every such offence . . . . . be guilty of a misdemeanor, and shall, on conviction thereof, be fined, etc., or imprisoned, etc., or both at the discretion of the court." This section is clearly not founded upon the fifteenth amendment, and, if constitutional at all, is so only by virtue of the clauses of the fourteenth amendment, which declare as follows: "All persons born and naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, . . . . . nor deny to any person the equal protection of the laws. Congress shall have power to enforce, by appropriate legislation, the provisions of this article." If this language of the fourteenth amendment, giving to congress power to legislate for preventing the abridgement of the rights of citizens of the United States, were not qualified by another provision of that amendment, and were allowed its widest signification, then it is broad enough to cover the 4th section of the enforcement act of May, 1870, which I have quoted, in the broadest signification of that section's language; and the national

courts would have jurisdiction to try any offence abridging any right of any citizen of the United States on any account; and the indictments at bar would give jurisdiction to this court over the offences charged.

But is this language to be so interpreted? Is it not rather to be limited by construction? If the latter, then the language is to be construed according to rules of statutory interpretation, which are as much a part of the statutory law as the statutes themselves. Although, as will appear in the sequel, it is unnecessary for me to do so with reference to the eight indictments under immediate consideration, I shall first treat this clause of the fourteenth amendment as if it were not qualified by any other clause in that amendment, or by the fifteenth amendment.

It is a settled principle of construction that all instruments are to be interpreted according to their real intention and object; and when statutes employ general terms, those terms are to be limited in giving effect to the statutes, according to the real meaning of their authors, rather than according to their literal meaning, so as to correct the evil and advance the remedy contemplated by them. The illustration of this principle, which is most familiar to the legal profession, is that given by Blackstone (book 1, p. 59). A law of Edward III. forbade all ecclesiastical persons to purchase provisions at Rome. If the term "provisions" had been given its widest meaning, it would have forbidden any of the English clergy who might happen to be at Rome from buying food; but the statute was construed with reference to its intention, which was to prohibit the purchasing of nominations by the pope to ecclesiastical benefices in England, which at that day were called "provisions." It is a general principle, that the language of statutes is, if possible, not to be so interpreted as to produce absurdity, or oppression, or evils greater than those designed to be remedied by them. Indeed, the very function and province of a court is to construe and apply the law according to its true meaning only, and for securing its real objects alone. It is, therefore, perfectly competent for the national courts to discriminate between "the privileges and immunities of citizens of the United States," alluded to by the fourteenth amendment, and to limit the meaning of the acts of congress passed to protect them (the fourth section of the first enforcement act among others), so as to make them conform in practice to the spirit of the constitution of the United States, which regards the national government as one of limited, express powers, and the governments of the states as of general powers, not expressly enumerated. The authority of the courts to enlarge the powers of the national government by construction has always encountered more or less disfavor. Their authority to limit those powers by construction has never been regarded with jealousy. The only difficulty in thus discriminating lies in

ascertaining the principle on which to proceed, and the line of distinction to be drawn in regard to the privileges of the citizens of the United States intended to be protected. I flatter myself, however, that this difficulty can easily be surmounted in considering the questions raised upon the indictments before us. The supreme court of the United States, in its decision in the Slaughterhouse Cases, 16 Wall. [83 U. S.] 36, has taken a part of the responsibility of this task off our hands. Those were cases in which the subject of complaint was an act of the legislature of Louisiana. That act created a joint stock company; empowered it to hold certain estate near the city of New Orleans; required that all animals which should be slaughtered within a large territory surrounding that city should be slaughtered upon the premises of this company; and gave it, in these and other respects, exclusive rights in abridgment of the like rights of other citizens, and especially of persons following the trade of butchering in the area described.

The United States supreme court held that the national courts had no jurisdiction to protect citizens of Louisiana, though they were citizens of the United States, in such privileges as were abridged in the act of incorporation complained of, passed by the legislature, and approved by the supreme court of the state. In its decision in these cases, pronounced by Justice Miller, the supreme court say (16 Wall. [83 U. S.] 77, 78): "Was it the purpose of the fourteenth amendment, by the simple declaration that no state should make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, to transfer the security and protection of all the civil rights which we have mentioned from the states to the federal government? And where it is declared that congress shall have power to enforce that article, was it intended to bring within the power of congress the entire domain of civil rights heretofore belonging exclusively to the states? All this and more must follow if the proposition of the plaintiffs in error be sound. For, not only are these rights subject to the control of congress whenever in its discretion any of them are supposed to be abridged by state legislation, but that body may also pass laws in advance, limiting and restricting the exercise of legislative powers by the states, in their most ordinary and usual functions, as in its judgment it may think proper, on all such subjects. And still further, such a construction, followed by the reversal of the judgment of the supreme court of Louisiana in these cases, would constitute this court a perpetual censor upon all legislation of the states on the civil rights of their own citizens, with authority to nullify such as it did not approve as consistent with those rights as they existed at the time of the adoption of this amendment. The argument, we admit, is not always the most conclusive which is drawn from the consequences urged

against the adoption of a particular construction of an instrument. But when, as in the case before us, these consequences are so serious, so far-reaching and pervading, so great a departure from the structure and spirit of our institutions; when the effect is to fetter and degrade the state governments by subjecting them to the control of congress in the exercise of powers heretofore universally conceded to them, of the most ordinary and fundamental character; when, in fact, it radically changes the whole theory of the relations of the state and federal governments to the people; the argument has a force that is irresistible, in the absence of language which expresses such a purpose too clearly to admit of doubt. We are convinced that no such results were intended by the congress which proposed those amendments, nor by the legislatures of the states which ratified them." That august court accordingly decided that it had no jurisdiction to protect the privileges which were abridged by the act of incorporation complained of, the privileges abridged being those which belong to citizens of the state as such, and distinguished from those which attached to them as citizens of the United States. Its decision authorizes us to construe the clauses of the fourteenth amendment in question, and the acts of congress passed to enforce them, according to their direct historical object, rather than their mere literal meaning; and, more particularly, so to construe them as to discriminate between those rights of the citizen which he has as a citizen of the state and those which belong to him as a citizen of the United States.

In Corfield v. Coryell [Case No. 3,230], Justice Washington defined the privileges and immunities which belong to citizens of the states as such to be those which he called "fundamental;" such as "belong of right to citizens of all governments, and always belonged to citizens of the several states of this Union from the time of their independence." They embrace those rights which belong to a man as a member of society, together with those which the constitution and laws of his state confer upon its citizens. On the other hand, the rights which we have as citizens of the United States are such as are implied in the language of Judge Taney, when he declared that "we are citizens of the United States for all the great purposes for which the federal government was established." For instance, a man as a citizen of Virginia may carry on a business here by paying a certain tax: in virtue of which fact a citizen of Maryland, as a citizen of the United States, has a right to carry on the like business in Virginia by the payment of no greater tax. So, under the constitution of the state, a man born in Virginia is a citizen here after a certain age; by virtue of which fact he may become, under the constitution of the United States, a citizen of New York by a change of residence to that state. This parallel between the rights held by citizens, respectively, in their two characters, might be run out through many examples; but the distinction is too plain to need further illustration. For other decisions on the subject see [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 203; [Mayor etc. of City of New York v. Miln] 11 Pet. [36 U. S.] 102; [License Tax Cases] 5 Wall. [72 U. S.] 471; [Paul v. Virginia] 8 Wall. [75 U. S.] 180; [U. S. v. De Witt] 9 Wall. [76 U. S.] 41; and [Ward v. Maryland] 12 Wall. [79 U. S.] 430.

Adopting this broad distinction, and availing of the authority given by the supreme court in its decision in the Slaughterhouse Cases, the national courts are justified in refusing to take cognizance of offences committed in violation of those rights which belong to a person as the citizen of a state, not created or conferred, but only guaranteed, by the national constitution; and in confining their jurisdiction to those rights which belong to persons peculiarly in their character as citizens of the United States. This much being settled, and inasmuch as the fourth section of the enforcement act of May, 1870, concerns only the citizen's right of voting, it is only necessary to inquire how the right of voting attaches to the citizen; whether in his character as a citizen of the state, or in that of a citizen of the United States.

Before the adoption of the fourteenth amendment, a man was a citizen of the United States only derivatively, by virtue of his being a citizen of a state. Such was the principle of the decision of the supreme court of the United States in the case of Dred Scott v. Sanford, 19 How. [60 U. S.] 393, in which that court expressly decided that as a man of African descent was not the citizen of any state, therefore he could not be a citizen of the United States. By the adoption of the fourteenth amendment, the new status of citizenship of the United States, independently of that of citizenship of the state, was first established; but it does not follow that the incorporation of this new provision into our national policy has abolished or obliterated the line of distinction which the national courts had claimed the power to draw between the rights of a person as citizen of a state and those which he had as citizen of the United States. There is not yet any general act of congress clothing the citizen of the United States proprio vigore with all the rights of the citizen of the state where he resides, and giving the national courts express jurisdiction to protect those rights. Certainly there can be no law of congress found which directly purports to constitute any citizen of the United States a voter in the state in which he resides. Indeed, such a law would seem to be unconstitutional; for the fourteenth amendment itself contains a clause which leaves to the states the power, always before possessed by and conceded to them, of prohibiting citizens of the United States from voting, and of declaring who shall be voters, even in national elections.

That amendment. in the second paragraph, provides that "when the right to vote at any election for the choice of electors for president and vice-president of the United States, representatives in congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years old, and citizens of the United States, except for participation in rebellion or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens bears to the whole number of male citizens twenty-one years of age in such state." Thus the right to vote, even of citizens of the United States, is left even by the fourteenth amendment itself, to be regulated and defined by the states, which had always held that power. The state of Virginia has accordingly exercised this prerogative, pursuant to her own uncontrolled views of justice and propriety, in the first clause of the third article of her state constitution. which is in these words: "Every male citizen of the United States twenty-one years old who shall have been a resident of this state twelve months, and of the county, city, or town in which he shall offer to vote three months next preceding any election, shall be entitled to vote upon all questions submitted to the people at such election;" following this general provision with the usual exceptions of persons committing crimes, etc. And here I will remark that the right to vote would seem to be not fundamental; not a natural right. The power to declare who shall be voters, who shall be constituents of the political sovereignty of a state, has been claimed by and conceded to each state from the beginning of our independence; and is expressly conceded by the clause of the fourteenth amendment which I last quoted. The right to vote would seem to be not an inherent right, but a conferred privilege; a privilege not derived from the United States. but from the state alone; a privilege belonging to the man as a citizen of the state, and not to him in his character as citizen of the United States. The noble liberality of Virginia in making every citizen of the United States resident within her borders a voter in every election. does not in any degree change the fact that he derives this right from herself. Nor does the obligation of the United States to guarantee to the states a republican form of government change the fact now existing. and which has existed from the founding of the Union, that to the states is left the power of defining and regulating the right of suffrage. a power without which a state could scarcely be considered as any longer retaining its autonomy.

It being, therefore, incontrovertible that the right to vote in a state election belongs to a man as the citizen of his state. it remains to ask what right connected with voting belongs to him as a citizen of the United States. Under the fifteenth amendment his right as a national citizen is—not to be prevented from voting "on account of race, color, or previous condition of servitude;" which is a right not involved in the indictments at bar. Has he any similar right in his national character under the fourteenth amendment? Whatever right the national citizen, as such, may have, under the general terms of the fourteenth amendment, not to be abridged in his privileges or immunities, so far as other privileges are concerned, yet that amendment gives him no such right as to the privilege of voting, because it expressly leaves to the states the power of regulating the right of suffrage in both state and national elections. It is therefore plain that not only is the right to vote derived from the state, and not only does it belong to the category of rights which it is peculiarly within the province of the state tribunals to protect, but it is excepted by the fourteenth amendment from those general privileges and immunities of citizens of the United States which the states are forbidden to abridge. It is indeed a right which the states are expressly allowed to abridge in every other respect than on account of race, color, and previous servitude. If the constitution gives this permission to the states, then no act of congress forbidding the abridgment of this right on other account than of race, color, etc., is constitutional, and no indictment founded upon such a law is valid to give jurisdiction of the offence charged to the national courts.

It is contended that from whatever source a right comes to a citizen of the United States, yet, once attaching to him, it is competent for congress and the United States courts to protect him in it. This argument would confer the power and duty of protecting the citizen of the United States from any of the ordinary offences at common law, such as murder, false imprisonment, and the like. This cannot be a sound proposition. There is an obvious distinction to be made on this subject. Although still unnecessary to my argument as to the eight indictments mentioned, I will advert to the distinction which should be drawn between rights proper and those improper for the jurisdiction of the national courts. It is that so well stated by Mr. Justice Bradley in his opinion in the case of U. S. v. Cruikshank [Case No. 14,897], where the learned justice distinguishes between those provisions of the national constitution which guarantee fundamental rights, the duty of protecting which properly belongs to the states, and those provisions which either create rights or enjoin in affirmative legislation upon congress for their protection.

I cannot but express a cordial and full concurrence in the following remarks of Mr. Justice Bradley on that subject. He says: "With regard to those acknowledged rights and privileges of the citizen which form a part of his political inheritance de-

rived from the mother country, and which were challenged and vindicated by centuries of stubborn resistance to arbitrary power, they belong to him as his birthright, and it is the duty of the particular state of which he is a citizen to protect and enforce them, and to do nought to deprive him of their full enjoyment. When any of these rights and privileges are secured by the constitution of the United States only by a declaration that the state or the United States shall not violate or abridge them, it is at once understood that they are not created or conferred by the constitution, but that the constitution only guarantees that they shall not be impaired by the state, or the United States, as the case may be. The fulfilment by the United States of this guaranty is the only duty with which that government is charged. The affirmative enforcement of the rights and privileges themselves, unless something more is expressed, does not devolve upon it, but belongs to the state government as a part of its residuary sovereignty." If this distinction be correct, then, as the right of voting is not conferred by the national constitution, nor even guaranteed by that instrument, except in a qualified and negative way by the fifteenth amendment, it is not one of those rights over which, when proposed to be exercised in a state election, congress or the national courts have jurisdiction.

Thus are we brought by legitimate argument founded upon the decision in the Slaughterhouse Cases, and the very able one in the Cruikshank Case [supra], to a conclusion against the validity of the eight indictments pending against the judges of election of Petersburg. But there is a much more direct method of reaching the same conclusion, which avoids a resort to the power of construction, and which renders useless the distinction drawn by the national courts in the cases alluded to between the rights belonging to a person respectively in his two characters of citizen of the state and citizen of the United States, and between the rights created or conferred, and those merely guaranteed by the national constitution. It is this: Admit for argument's sake, that the fourteenth amendment, in its first paragraph, was intended to prohibit the abridgment of any privilege of the citizen by the state, or by its citizens, on any account whatever: yet the second paragraph of the same amendment, which leaves to the states the power always held by them to prescribe the qualifications for suffrage at their pleasure in national and state elections, expressly excepts the right of voting from those general privileges; and the most that can be insisted upon is that the fourteenth amendment protects the citizen of the United States in all privileges except the right of voting, and leaves this right to be regulated ad libitum by the states. It was this latter fact which cre-

ated the necessity for the fifteenth amendment, and that amendment would mean nothing, and would have been wholly unnecessary if before its adoption the states had not had uncontrolled power over the right of suffrage  Its sole object was to limit the unrestrained power of the state over this right which had been conceded by the fourteenth amendment; but it undertook to limit the power only in one respect. It declared in substance that notwithstanding the states possessed uncontrolled power over this right they should be restricted in exercising their power at least this far, to wit: They should not deny or abridge the right of the citizen to vote "on account of race, color, or previous condition of servitude."

I am, therefore, of opinion that any law of congress is unconstitutional which makes the preventing of a voter from voting in a state election penal on any other account than of race, color, or previous condition of servitude; and that any indictment charging such an offence, though founded upon such a law or section of a law of congress, is invalid to give jurisdiction of such an offence to this court. I think, consequently, that the demurrers of the defendants to the eight indictments against the Petersburg judges of election are good, and that the indictments should be quashed.

II. The three indictments pending against certain registrars of election in Petersburg differ in two respects as to the questions which I have been considering, from those pending against the judges of election.

1. They allege that the persons who were prevented from registering were of African descent, but omit to charge that they were prevented from registering "on account of race, color, or previous condition of servitude." These are not indictments, therefore, founded upon the fifteeenth amendment or any act of congress passed for enforcing it. We are not at liberty to infer from the mere circumstances that a man was of any particular race, and prevented from exercising a right, that he was so prevented on account of his race. That fact must be charged before it can be proved, and the failure to charge it is, I think, fatal to these indictments, so far as the fifteenth amendment and the statutes enforcing it are concerned.

2. These three indictments each charge in substance that the defendant "did refuse and knowingly omit to give to all citizens of the United States in his ward the same and equal opportunity, without distinction of race, color, or previous condition of servitude, to register, etc.; but to the contrary thereof, refused and knowingly omitted to give A., B., C., D., and E. the opportunity to register which he gave to others, the said A., B., C., D., and E. being qualified, etc., and citizens of the United States of "African race and descent." By not charging

that the refusal was on account of the race, etc., of the injured persons, these indictments, for the reasons I have stated, do not come under the fifteenth amendment. If they are valid at all, to give jurisdiction to this court it must be under the fourteenth amendment and the 4th section of the act of May, 1870. But, for reasons already abundantly stated, registration is a right conferred by the state. Each of the three indictments under immediate consideration expressly recites that the right is conferred by the laws of Virginia, and that the duties of the registrar were duties imposed by state laws. Nor do they charge that in consequence of the failure of the injured persons named to be admitted to registration they lost their right to vote either at a state election or an election held for officers of the United States. The denial merely of registration is an offence against the state, if it be on any other account than of race, color, etc. If the indictments had charged that the denial had been on account of race, etc., the offence would have been cognizable here; or if, after charging the denial, the indictments had gone on to charge that in consequence thereof the citizen of the United States was prevented from voting at an election held for a member of congress, or electors of a president of the United States, I am inclined to think that the offence would have been cognizable here. But a charge merely that a citizen of the United States was denied registration, without other allegation to make it appear that some right was abridged which belonged to the man as a citizen of the United States, is not sufficient to give cognizance of the offence to this court. I am, therefore, of opinion that the demurrers to these indictments against the Petersburg registrars ought to be sustained, and that the latter ought to be quashed.

The judges being divided in opinion, the case was certified to the supreme court of the United States.